UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA ex rel. ROBERTO HERNANDEZ, | ) ) ) | |
|---|---|---|
| Petitioner, | ) ) | No. 13 C 2221 |
| v. | ) ) | Chief Judge Rubén Castillo |
| KEVWE AKPORE, Warden, Hill Correctional Center, | ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Roberto Hernandez ("Petitioner") filed a petition pursuant to 28 U.S.C. § 2254 (the "Petition") challenging his 2010 murder conviction in Cook County, Illinois. (R. 1, Pet.) For the reasons stated below, the Petition is denied.

### BACKGROUND[1]

Petitioner was convicted of fatally shooting Bernardo Guillen on December 19, 1979, while Guillen was working as a bartender at a Chicago bar called La Capana. (R. 12-1, Ill. App. Ct. Order at 2.) Eusebio Lopez, a friend of Guillen's, arrived at the bar around 1:00 a.m. on that date. (*Id.*) At that time, Lopez and Guillen were the only ones in the bar. (*Id.*) About 20 minutes later, a group of men arrived. (*Id.*) Lopez recognized two of the men as Erasmo Hernandez ("Erasmo"), Petitioner's father, whom Lopez knew from the neighborhood, and Juan Salazar Solis ("Solis"), who performed as an accordion player at another local bar. (*Id.*) Lopez later identified Petitioner as one of the other men. (*Id.* at 3.) Lopez watched as Petitioner went up to speak with Guillen. (*Id.* at 2.) After the two exchanged words, Petitioner pulled out a gun

---

[1] In deciding the Petition, the Court must presume the facts set forth by the state court are correct. 28 U.S.C. § 2254(e)(1).

1

and shot Guillen. (*Id.*) Lopez tried to flee, but Petitioner moved toward him, pointed the gun at his head, and told him that if he talked Petitioner would kill him. (*Id.*) Petitioner put the gun down after Erasmo told Petitioner not to "hit" Lopez. (*Id.*) Lopez then ran out of the bar and flagged down police. (*Id.*)

During an interview at the police station a few days later, Lopez identified Erasmo, Solis, and Petitioner from police photos.[2] (*Id.* at 3.) Lopez told police that Petitioner was the one who shot Guillen. (*Id.*) Police went to arrest the men, but only Erasmo and Solis could be located. (*Id.*) Solis falsely stated that he was not present when the shooting occurred, and he and Erasmo were ultimately released. (*Id.*) Police obtained an arrest warrant for Petitioner, and also placed his photograph in a police bulletin. (*Id.*) Petitioner's whereabouts remained unknown for more than 25 years. (*Id.* at 3-4.)

Sometime in 2007, two Chicago police officers working "cold case" files, Detective Robert Rodriguez and his partner Detective John Pellegrini, were notified by agents with the Federal Bureau of Investigation ("FBI") that someone in California was using the social security number associated with the 1979 arrest warrant. (*Id.* at 4.) After conducting an investigation, the detectives traveled to California and, along with FBI agents, arrested Petitioner on October 2, 2007. (*Id.*) Petitioner was brought to an FBI office in Fresno where he met with the Chicago detectives. (*Id.*) Detective Rodriguez advised Petitioner that he was investigating a 1979 homicide in Chicago. (*Id.*) He then showed Petitioner the police bulletin with his photo and asked whether he knew the person in the photo. (*Id.*) Petitioner identified the person as himself. (*Id.*) Detective Rodriguez then advised Petitioner of his rights under *Miranda v. Arizona*, 384

---

[2] The other men were later identified as Juan Hernandez and someone named "Lavota." (R. 12-8, Trial Tr. at B183.) Both men were deceased by the time of Petitioner's trial. (*Id.* at B212.)

2

U.S. 436 (1966). (*Id.* at 6.) Petitioner invoked his right to counsel, and the interview was terminated. (*Id.*)

In March 2010, Petitioner was brought to trial on murder charges in the Circuit Court of Cook County. (R. 12-8, Trial Tr. at B1.) Lopez and Solis both testified and identified Petitioner as the man who had shot Guillen.[3] (R. 12-1, Ill. App. Ct. Order at 2-3.) During the trial, Petitioner's counsel moved to suppress Petitioner's statement to police identifying himself as the man in the 1979 photo. (*Id.* at 3.) The state responded that given the passage of time, the police were simply trying to verify that the man in the photo was the same man they had arrested in California. (*Id.*) The trial court denied the motion to suppress, finding that the question about the photo was a preliminary booking question outside the scope of *Miranda*. (*Id.*) Thereafter, Detectives Rodriguez and Pellegrini were permitted to testify regarding Petitioner's statement. (*Id.* at 4.) The jury found Petitioner guilty of murder. (*Id.*) The trial court sentenced him to 25 years in prison. (*Id.*)

On direct appeal, Petitioner raised one claim: that the admission of his statement identifying himself as the man in the photograph violated his *Miranda* rights. (R. 12-2, Pet.'s App. Br.) The Illinois Court of Appeals rejected this argument, concluding that admission of the statement was proper under *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), because the question was a "routine booking" question that fell outside the scope of *Miranda*. (R. 12-1, Ill. App. Ct.

---

[3] Luis Escamilla, Petitioner's former brother-in-law, was also a witness a trial. He testified that on the night of the shooting, Petitioner and Erasmo came to his home, which was near La Capana, sometime after 1:00 a.m. (R. 12-8, Trial Tr. at B131-B147.) They were nervous, and spoke about having some "trouble" at a bar. (*Id.* at B138.) Erasmo asked Escamilla to drive Petitioner and Erasmo home in Petitioner's car, and he complied. (*Id.* at B139-B140.) When Escamilla went out to the car, he noticed that Petitioner's license plate had been bent upwards so that the numbers were obscured. (*Id.* at B141.) Later at Petitioner's apartment, Escamilla overheard a conversation in which Petitioner said that he was planning to go to Mexico. (*Id.* at B143-B144.) Escamilla stayed overnight at the apartment, and when he woke the next morning, Petitioner was gone. (*Id.* at B147.)

3

Order at 5-7.) Petitioner filed a petition for leave to appeal to the Illinois Supreme Court raising this same claim, (R. 12-4, Pet. for Leave to Appeal), but his petition was denied, (R. 12-5, Ill. S. Ct. Order).

In March 2013, Hernandez filed his federal Petition in this Court. (R. 1, Pet.) He raises one claim: that the state court's rejection of his claim challenging the admission of his statement constituted an unreasonable application of U.S. Supreme Court precedent. (*Id.* at 8.) Respondent answered the Petition, and argues that Petitioner's claim fails on the merits. (R. 11, Answer; R. 12, State Ct. R.)

## LEGAL STANDARD

The Petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, habeas relief cannot be granted with respect to any claim adjudicated on the merits by a state court, unless the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Under this deferential standard, the Court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is contrary to federal law if the state court "applies a rule different from the governing law" set forth in Supreme Court precedent, or if it decides a case differently than the Supreme Court "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The Court may grant habeas relief under the "unreasonable application" clause if the state court

4

identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). The state court's decision must be more than incorrect or erroneous; it must be "objectively unreasonable." *Id.* This is a difficult standard to meet: "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). To obtain relief, a habeas petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

## ANALYSIS

Petitioner raises one claim in his Petition: that the state court's rejection of his claim challenging the admission of his statement constituted an unreasonable application of Supreme Court precedent. (R. 1, Pet. at 8.) Respondent argues that this claim fails on the merits. (*See* R. 11, Answer at 13-20.)

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. In interpreting this provision, the Supreme Court held in *Miranda* that statements made by a criminal defendant in police custody are admissible at trial only if the defendant was first given several warnings: that he has "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. If a

defendant invokes any of these rights, police are prohibited from interrogating him, and any statements obtained in violation of the rule will be inadmissible at trial. *Muniz*, 496 U.S. at 589. Nevertheless, not all police questioning falls within the scope of *Miranda*.[4] In *Muniz*, the Supreme Court clarified that warnings need not be given before police ask a "routine booking question," such as the defendant's "name, address, height, weight, eye color, date of birth, and current age." *Muniz*, 496 U.S. at 600-01. Obtaining biographical data from a suspect is "reasonably related to the police's administrative concerns," and thus police need not give a *Miranda* warning before asking these types of questions. *Id.* at 601-02.

Notwithstanding the routine booking exception, the Supreme Court in *Muniz* concluded that the police violated the defendant's *Miranda* rights. In that case, the defendant was arrested on charges of drunk-driving. *Id.* at 585. After obtaining routine booking information from him, including his name, age, and address, the officer asked him, "Do you know what the date was of your sixth birthday?" *Id.* at 586. Muniz responded, "No, I don't." (*Id.*) This statement was later used against him at trial. *Id.* at 587. The Supreme Court found the general booking questions proper, but concluded that the final question fell within the scope of *Miranda*. *Id.* at 593-94. The Court concluded that the officer did not have any real need to know the date of the defendant's sixth birthday; rather, the question was asked to reveal the "physiological functioning of [defendant's] brain." *Id.* at 593. In other words, by asking the question, the officer was trying to assess whether the defendant was drunk, an element of the drunk-driving

---

[4] *Miranda* only applies to "custodial interrogation." *See Bobby v. Dixon*, 132 S. Ct. 26, 29 (2011). There is no dispute here that Petitioner was in police custody at the time he made the statement, as the parties stipulated to this fact in the state proceedings. (*See* R. 1, Pet. at 8.) There is also no dispute that Petitioner's statement "relate[d] a factual assertion or disclose[d] information" as required to trigger the privilege. *See Doe v. United States*, 487 U.S. 201, 210 (1988).

offense. *Id.* Because the "content of [the defendant's] truthful answer supported an inference that his mental faculties were impaired," police were required to give *Miranda* warnings before asking the question. *Id.* at 599.

Here, the Illinois Court of Appeals upheld the admission of Petitioner's statement identifying himself as the man in police bulletin photo. (R. 12-1, Ill. App. Ct. Order at 5-7.) In doing so, the court looked to the Supreme Court's opinions in *Miranda* and *Muniz*, and determined that the question about the photo constituted a routine booking question under *Muniz*. (*Id.*) Based on the record, this was not an unreasonable application of *Muniz*. As outlined above, the record reflects that nearly 30 years had passed between the date of the shooting and the date of Petitioner's arrest.[5] (*Id.* at 6.) He was arrested in another state—thousands of miles from Chicago—and, as the trial court noted, "Roberto Hernandez" is a common name. (*See* R. 12-9, Trial Tr. at C22-23.) Even asking Petitioner, "Are you Roberto Hernandez?" would not clarify whether they had arrested the right person. Under these circumstances, the detectives reasonably sought to confirm that the man they had arrested was the right "Roberto Hernandez" by asking him about the photo. Once the detectives verified that Petitioner was the person they were seeking, he was given his *Miranda* warnings. (R. 12-1, Ill. App. Ct. Order at 6.) When he invoked his right to counsel, the interview was terminated. (*Id.*) This suggests the detectives were not simply fishing for incriminating information, but rather, addressing a matter reasonably related to police "administrative concerns." *See Muniz*, 496 U.S. at 601-602.

While questions about a person's identity or other basic information might in some circumstances trigger *Miranda* concerns, such as where the person's identity relates to an

---

[5] The record reflects that Petitioner was approximately 36 years old at the time of the shooting, and approximately 64 years old at the time of his arrest in California. (*See* R. 12-6, Arrest Report at 14.)

element of the charge, the Illinois appellate court reasonably concluded that this was not one of those cases. *See United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000) (observing that it would be a "rare case indeed in which asking an individual his name... would violate *Miranda*," but finding that such a situation could arise where the defendant was charged with impersonating a law enforcement officer or a comparable offense focused on identity). Nor is it critical that Petitioner gave a response to the question that proved to be incriminating. *See United States v. Knope*, 655 F.3d 647, 652 (7th Cir. 2011) (police were not required to provide *Miranda* warnings to suspect before asking him where he lived, even though they obtained a search warrant based on his response which led them to incriminating evidence, because asking for his address was a proper booking question); *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010) ("A request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating."); *United States v. Washington*, 462 F.3d 1124, 1133 (9th Cir. 2006) (police did not violate *Miranda* by asking defendant for his gang nickname prior to advising him of his rights because "[q]uestions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime").

In addition, the question is not how this Court would rule on the admissibility of the statement if presented with the issue *de novo*. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004). Instead, the question is whether the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87. Based on the facts of this case, this Court cannot conclude that the state court's rejection of Petitioner's claim was an unreasonable application of *Miranda* and *Muniz*. *See Yarborough*, 541 U.S. at 665 (where state court

8

considered Supreme Court case law applicable to *Miranda* claim and reached a decision that was "within the matrix of our prior decisions," federal habeas relief was unavailable, even though reasonable jurists could disagree with the state court's ultimate conclusion). Accordingly, Petitioner has not satisfied the standard for obtaining federal habeas relief.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the Court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). Given the unusual facts of this case, the Court concludes that reasonable jurists could debate the outcome of the Petition. Accordingly, the Court grants the Petitioner a certificate of appealability on the following issue: Whether the state court's rejection of his claim constituted an unreasonable application of *Muniz*.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Petition (R. 1). The Court GRANTS Petitioner a certificate of appealability on the following issue: Whether the state court unreasonable applied *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), in upholding the admission of Petitioner's statement identifying himself from a police bulletin photo during police questioning. The Clerk of Court is DIRECTED to enter judgment consistent with this order.

ENTERED: _____
**Chief Judge Rubén Castillo
United States District Court**

**Dated: October 30, 2014**

10